**CITY OF GARY, Appellant
(Defendant Below),**

v.

**STREAM POLLUTION CONTROL BOARD OF the STATE OF INDIANA,
Appellee (Plaintiff Below).**

No. 3–280A62.

Court of Appeals of Indiana,
Fourth District.

June 17, 1981.
Rehearing Denied July 22, 1981.

Transfer Denied Oct. 27, 1981.

Charles A. Ruckman, Corporation Counsel, Gary, for appellant (defendant below).

Linley E. Pearson, Atty. Gen. of Indiana, Jeff G. Fihn, Deputy Atty. Gen., Indianapolis, for appellee (plaintiff below).

MILLER, Judge.

The City of Gary (City) appeals the trial court's issuance of a preliminary injunction mandating either its compliance with an agreed order entered into with the Stream Pollution Control Board (Board) governing the operation of a certain solid waste disposal site (otherwise referred to herein as "sanitary landfill") or their cessation of the operation of such site in a manner which does not comply with the agreed order pending final hearing. The City argues the State of Indiana, through the Board, is estopped from enforcing the order due to the State's refusal, through the State Board of Tax Commissioners, to approve "excessive" tax levies sufficient to fund proper operation of the landfill. The Board argues financial inability is not a defense to noncompliance and does not equitably estop enforcement of the agreement. We affirm.

## FACTS

On June 21, 1977, the Board filed a verified complaint for preliminary and permanent injunctions against the City seeking the latter's compliance with an order, adopted by the Board and agreed to by the City in October of 1975, dictating standards for operation of a refuse disposal facility located in Gary, Indiana. The complaint alleged the City failed to comply with several items in the order, including the following provision:

"That the City of Gary may until June 1, 1976, continue the operation of the refuse disposal site ..., provided all of the following specific conditions are met from the date of the order to June 1, 1976:

1. All refuse will be compacted on a slope of between 3:1 and 5:1 and covered with six inches of impermeable soil on the day such refuse is deposited, except that refuse deposited after 5:00 p.m., will be compacted and covered on the following morning."

Other alleged violations of the order consisted of failure to 1) prevent blowing paper from leaving the work face; 2) submit specified plans, contracts and studies regarding various aspects of operation and management; 3) prepare and submit notification for inspection of a refuse trench; 4) apply six inches of clay soil to certain areas and to construct an all-weather road; and 5) submit monthly reports discussing a) analysis of samples, b) breakdown of landfill equipment and c) progress made toward obtaining additional funds for daily operations in 1976 and for the purchase of clay soil.

On July 11, 1977, the date initially scheduled for a hearing on the complaint for a preliminary injunction, the parties testified to a proposal governing operation of the site and agreed to a 120 day continuance during which time the City would attempt to bring the landfill into compliance. Further action was not taken in the cause until September 25, 1978 when the court, on its own motion, issued a rule to show cause why the action should not be dismissed pursuant to Ind. Rules of Procedure, Trial Rule 41(E). The Board responded by requesting

the court to retain jurisdiction alleging the parties were then negotiating a final settlement. Apparently a final settlement was never reached. The cause was set for hearing on January 29, 1980, and on January 25, 1980 the City filed an answer denying its failure to comply with the 1975 order and affirmatively alleging the State's failure to provide funding through approval of excessive tax levies.

At the hearing for a preliminary injunction held on January 29, the City introduced evidence showing a continuing pattern of financial difficulty in operating the landfill since approximately 1974. At some unspecified time, permission was obtained from the Economic Development Administration in Chicago to transfer "several hundred thousand dollars," originally granted for downtown improvements, to the landfill operation for the purchase of cover materials. A similar amount was expended to construct a sewer for de-watering and a federal grant was obtained to construct a building to house equipment. Revenue sharing money and funds repeatedly transferred from the General Services Department were also used to finance operations at the landfill as various problems arose. Apparently, however, these financial maneuvers occurred prior to 1980 and in fact were sufficient to bring the landfill into compliance with most of the order's provisions.

The primary violation currently existing appears to be the failure to comply with item one of the agreed order, quoted above, requiring daily application of cover. The City admitted it is in violation of this provision but relied on the defense of financial impossibility by introducing evidence of the landfill's 1980 budget and expenses. Specifically, the evidence relevant to the current violation revealed an annual cost between $212,160 and $254,592 for clay or sand cover and approximately $497,000 to $515,000 then needed for the purchase of two dump trucks, a compactor, a bulldozer and a tractor-loader.[1] Cover material had previously been provided free of charge by government employed contractors seeking a place to deposit excavated clay. According to the testimony, the landfill was not presently receiving free cover material apparently due to the current lack of any government construction producing such material, necessitating the purchase of sand for cover.

On the other hand, the Deputy Controller for the City of Gary testified the landfill budget for 1980 totaled $300,408 only $1,200 of which was "unencumbered" as of January 29, 1980, the date of the hearing.[2] Apparently the landfill's budget was funded by revenue sharing money and local property taxes. Since revenue funds were not available the City was forced to rely principally on local funds derived from the property taxes for 1980. The Deputy Mayor testified the final tax rate for the City is set by the State Board of Tax Commissioners. Effective between 1973 and 1977, the legislature passed tax control laws which generally froze the tax rate but left each county with the option of adopting a local income tax. Ind. Code 6–3.5 et seq. Lake County chose not to exercise this option. Since 1977 there have been legislative controls on the tax levy rather than the rate, although under both schemes there were statutory exceptions allowable at the option of the Tax Control Board. Ind. Code 6–3.5–1–12. One such exception permits application to the Tax Control Board for an excessive levy when legislation requires a service which forces additional spending by governmental units. Another exception since 1977 provided for inflation or growth factors,

---

1. An equipment company representative testified these latter figures represented list prices but 10% to 15% was typically discounted in government bids.

2. The 1980 budget ordinance for the landfill, submitted as an exhibit, contemplated expenses as follows:

```
"Salaries & Wages              $115,408
  Repairs & Maintenance          40,000
  Other Contractual Services     40,000
  Fuel                           26,000
  Garage & Motor Supplies        40,000
  Repair Parts                   13,000
  Other Materials                 6,000
  Other Equipment                20,000
                                --------
     Total                     $300,408 "
```

which are in part determined by the highest levy since 1973. The City's applications under these exceptions has been denied every year since 1976. In addition, there was testimony suggesting the levy allowed the City was approximately two million dollars below the maximum levy allowed under the controls and has never reached the amount allowed in 1973, the year of the City's highest levy. At the time of the hearing, the City had petitioned the Tax Commission to review their maximum levies and their denial of treatment under the exceptions.

Pursuant to Ind. Rules of Procedure, Trial Rule 52(A)(1), the trial court issued special findings of fact stating among other things that the City was in violation of the agreed order and had not objected or opposed the issuance of the agreed order after its adoption. The court's judgment gave the City one month to comply, ordered an inspection by the Board at the end of that time and required a report of the Board's findings to the court which would result in a preliminary injunction if the findings indicated continuing non-compliance. The City was further preliminarily enjoined from operating the site in violation of the order after the one month period had expired on February 29, 1980. On February 19, 1980 the City was granted a stay from the trial court's order and this appeal was perfected.

## ISSUE

The sole issue raised on appeal is whether the Board, a state agency, is estopped from enforcing the agreed order due to the alleged failure of the State Board of Tax Commissioners to approve an excessive tax levy sufficient to finance proper operation of the landfill.

## DISCUSSION

■ Generally, the purpose of a temporary injunction is to maintain the status quo or to prevent irreparable injury until such time as the matter in dispute can be fully adjudicated at a trial on the merits. *Green v. Board of Commissioners of Scott County*, (1969) 251 Ind. 535, 242 N.E.2d 844; *Rees v. Panhandle Eastern Pipe Line Co.*, (1978) Ind.App., 377 N.E.2d 640. However, where the legislature has statutorily declared that the acts sought to be enjoined are unlawful or clearly against the public interest, the party seeking injunctive relief need show neither irreparable injury nor a balance of hardship in their favor. *Union Ins. Co. v. State ex rel. Ind. Dept. of Ins.*, (1980) Ind.App., 401 N.E.2d 1372; *Rees v. Panhandle Eastern Pipe Line Co., supra.* The granting of a preliminary injunction rests within the sound discretion of a trial court and this Court will not disturb the exercise of that discretion unless it is shown the trial court's action was arbitrary or constituted a clear abuse. Ind. Rules of Procedure, Trial Rule 52(A); *Negley v. Lebanon Community School Corp.*, (1977) 173 Ind.App. 17, 362 N.E.2d 178; *Peters v. Davidson, Inc.*, (1977) 172 Ind.App. 39, 359 N.E.2d 556. We, therefore, review the trial court's decision for an abuse of discretion only and will not review the final merits of the cause. *Peters v. Davidson, Inc., supra.*

Here, the City does not dispute the power of the Board to execute orders governing the operation of such facilities, nor do they dispute the authority of the Board to institute proceedings to enforce such orders.[3] Rather the City argues the enforcement of

---

**3.** The Stream Pollution Control Board was established by Ind. Code 13-1-3. It was designated an agency of the Environmental Management Board created under IC 13-7-2. The Stream Pollution Control Board's power to administer the Refuse Disposal Act (IC 19-2-1) includes the power to promulgate rules and regulations for the operation of solid waste disposal facilities and to enforce its orders regarding the same through an action for injunctive or mandatory relief brought in a court of competent jurisdiction. IC 13-7-6-1 originally vested the power to administer the Refuse Disposal Act in the Environmental Management Board, which subsequently delegated the power of enforcement to the Stream Pollution Control Board, as provided for in IC 13-7-6-4. IC 13-7-5-1; IC 19-2-1-31—32. *See also* IC 4-22-1-27. Pursuant to their statutory power, in 1975 the Board promulgated regulations governing the operation of sanitary landfills. *See* 330 IAC 4-5-1 *et seq.* These regulations appear to be the basis for the majority of provisions contained in the agreed order between

regulations which have a "severe local fiscal impact" should be abated "until such time as the state at least allows the City of Gary to raise the necessary revenues." The Board argues the financial distress alleged by the City has existed since 1973 and since the City agreed to the order without objection upon its adoption in 1975 it is prevented from raising the defense of financial difficulty in the enforcement proceedings. We agree with the Board.

■ We first note municipalities are not favored over other entities in pollution cases. *Iowa Water Pollution Control Comm. v. Town of Paton,* (Iowa 1973) 207 N.W.2d 755; *State ex rel. Harris v. City of Lakeland,* (1940) 141 Fla. 795, 193 So. 826; *Board of Purification of Waters v. Town of Bristol,* (1931) 51 R.I. 243, 153 A. 879. More specifically, the Indiana statutes governing environmental management make no distinction between municipalities operating on public funds and private business entities, but impose equal burdens of compliance on all polluters. For example, IC 19–2–1–31 provides in part: "No person, firm, association, corporation, county, city, town, political subdivision of the state, or unit of government shall establish, operate or maintain open dumps...." Our legislature has declared "open dumps ... to be inimical to human health," IC 19–2–1–31, and has accorded municipalities the same status as other polluters under its mandates.

Consistent with this policy of imposing pollution controls equally and without regard for a polluter's financial resources, we further recognize an elemental principle of environmental law as summarized in 39A C.J.S. *Health and Environment* § 144 (1976):

> "In the absence of a statutory provision therefor financial considerations do not affect the legality of an order.... An order must not impose an arbitrary and unreasonable hardship on the person against whom it is directed, although an order requiring the cessation of pollution

by a political subdivision is not required to be made contingent on the receipt of funds to carry out the order from other governmental entities." (Footnotes omitted.)

*Id.* at 617–18. This principle is supported by a clear legislative policy, recognized nationally, that health considerations take precedence over economic and technological considerations. Consequently, financial and technological defenses when raised by pollution sources have been typically rejected at both common law and under federal and state legislation. *See* W. Rogers, Jr., Environmental Law at §§ 2.11 and 3.9(c) (1977).

This is not to say that economic factors are not proper considerations for other purposes and at other stages in the proceedings. Financial inability does not affect the legality of an order but it may affect the reasonableness of a schedule for compliance with the order. In *Iowa Water Pollution Control Comm. v. Town of Paton, supra,* the Town appealed from the trial court's order compelling it to comply with the consent order adopted by the Iowa Water Pollution Control Commission, arguing the order was unreasonable because it would be impossible for it to finance a sewage treatment facility. The Iowa Supreme Court held that financial considerations did not affect the legality of the Commission's order but recognized that economic hardships *not reasonably foreseeable at the time of the order* might be properly considered in an enforcement proceedings on the issue of the date for ultimate compliance. We quote the following from that decision:

> "We hold the validity and reasonableness of a colorable commission order are conclusively established by failure to appeal as to circumstances then existing and reasonably foreseeable. However, in an enforcement proceeding under § 455B.24, [providing for judicial review of the order's reasonableness in a contempt action] if subsequent events not reasonably foreseeable at the time the unappealed order was entered raise a

the parties herein and specifically delineate standards for the daily application of cover

material at the disposal site. *See* 330 IAC 4–5–13.

question as to the vaildity [sic] or reasonableness of the order, such issues are to be heard and determined, and a compliance order is not to be entered unless the court finds the order lawful and reasonable under circumstances then existing. Since § 455B.24 makes failure to obey the commission order *prima facie* evidence of contempt, the burden to prove illegality or unreasonableness is on the party resisting enforcement. Cf. § 455B.49, The Code, 1973.

The statute does not permit financial considerations to affect the legality of a commission order. Polluters are equally affected by the prohibitions and mandates of the law without regard to the size of their pocketbooks. However, we are convinced the legislature intended financial problems subsequent to and not reasonably foreseeable at the time of an otherwise final commission abatement order to be among the factors properly considered in an enforcement proceeding on the issue of the reasonableness of its terms. *Such evidence does not bear on whether the pollution must be abated, but it does affect how and when abatement is to be accomplished."* (Emphasis added.)

*Id.* at 763.

Similarly, in *State ex rel. Harris v. City of Lakeland,* (1940) 141 Fla. 795, 193 So. 826, the Supreme Court of Florida unequivocally denied the existence of a city's financial difficulties as a defense to a public nuisance action:

"If a public nuisance is conclusively proven, the responsibility will be on the city to remove it. This it may do by modernizing its present sewage disposal facilities or by providing additional ones. *It cannot plead poverty or inability to remove a nuisance created by it that has become deleterious to the public health."* (Emphasis added.)

*Id.* at 797, 193 So. at 827. *Accord, City of Miami v. City of Coral Gables,* (Fla.App. 1970) 233 So.2d 7 (upholding rights of city residents to enjoin operation of an incinerator which was discharging pollutants in violation of an ordinance.) This same defense was also summarily rejected in *Board of Purification of Waters v. Town of Bristol, supra.* In that case the Town was ordered to adopt a system to control pollution caused by the discharge of raw sewage into the harbor. Although the Town attacked the validity of the order on other grounds, it admitted the need for remedial action but refused to discontinue the pollution because of the expense involved. The Florida Court ruled the objection was to no avail given the order's validity. *See also Bortz Coal Co. v. Department of Environmental Resources,* (1972) 7 Pa.Cmwlth. 362, 299 A.2d 670.

■ The facts presented in the instant case are very similar to those addressed in the Iowa decision noted above. The City here acknowledges the difficulties in financing the operation of the landfill have existed since at least 1974; it also admits it consented to the order in 1975 and did not raise any objections to the order's adoption. Furthermore there is no contention the terms of the order were unauthorized or unreasonable at the time of its adoption in 1975. Financial difficulties foreseen at the time of the order can not now affect the order's legality, nor can they excuse compliance with its terms.

■ The City acknowledges in its brief that normally a municipality "would not be allowed to complain that it didn't have enough money to comply with the state's order." However, they claim this general rule contemplates both the unfettered exercise of a municipality's general taxing power, and consequently the constant ability to comply with an order. Thus it concludes where the City does not possess an unfettered power to tax, the situation which allegedly exists in the instant case, the general rule does not apply. The sole case cited by the City for that proposition is *People ex rel. Stream Control Commission v. City of Port Huron,* (1943) 305 Mich. 153, 9 N.W.2d 41, where the city raised the defense of financial inability to comply with an order issued by the Stream Control Commission requiring the city to construct a sewage treatment plant and restraining the

discharge of untreated sewage into a nearby river. The Supreme Court of Michigan rejected the City's defense of financial inability, noting that although the city could not issue bonds to finance the operation there was no evidence showing that it could not legally perform since it obviously had the taxing power to raise the necessary funds. It is from this portion of the Michigan decision that the city in the instant case concludes its limited taxing power should excuse it from compliance with the Board's order.

We do not believe this sole case cited by the City stands for the proposition that a municipality's current difficulty in exercising its taxing power can affect the validity of the order or automatically excuse compliance. The Michigan Supreme Court only found that Port Huron did in fact have the ability to raise sufficient funds and did not precisely reach the larger question of whether true economic inability could render an order invalid. Our reading of the case is further supported by the Michigan Court's recognition of the Commission's authority to enter the order. Furthermore, in a conclusion resembling the holdings in the authorities discussed *supra*, the Michigan Court rejected the City's apparent additional defense that the necessary materials were difficult to acquire due to war conditions. With regard to this latter issue the Court observed such difficulty did not and should not prevent the City from carrying out the commission's mandate, but, rather, would only warrant allowance of a reasonable time for completion of the project.

The case at bar is similar, however, to the Michigan case in another more important respect, that is in the failure of the City to prove it had explored all financial possibilities for financing operations in accordance with the order. While the City presented evidence of inability to increase the property tax levy or to transfer further monies from the general fund, it failed to present evidence showing its exploration of other avenues for financing. The Solid Waste Disposal Facilities Act, IC 19–2–1, provides several methods for financing sanitary landfill operations, including the issuance of revenue bonds [4] and the imposition of service rates [5] in addition to taxation and budget transfers.[6] At the hearing, the City did not address the feasibility of utilizing the first two methods, nor did it make any reference to these possibilities in its brief. We are therefore at a loss to determine whether the City has in fact encountered even a true temporary financial "inability" to finance the landfill operations, and the proof of its allegation in this regard is therefore fatally deficient for purposes of this appeal.

Given the City's failure to show its financial inability to comply with the order and, in any event, since financial difficulties do not affect the validity of the order, we must conclude the trial court did not abuse its discretion in granting the preliminary injunction which prevented any further damage to the environment caused by improper operation of the landfill until such time as a final hearing can be held.

Affirmed.

YOUNG, P. J., and CHIPMAN, J., concur.

---

**4.** IC 19–2–1–3 provides in part:
"Every such county, city and town in the state of Indiana is hereby authorized and empowered to establish, acquire, construct, install, operate and maintain facilities for the collection and disposal of refuse, to secure the collection and disposal of refuse accumulated within or without the corporate limits of such county, city or town, *and to issue revenue bonds to pay in whole or in part the costs of such facilities.*" (Emphasis added.) *Accord,* IC 19–2–1–12.

**5.** IC 19–2–1–9 provides:
"The acquisition, establishment, construction, installation, operation and maintenance of facilities and land for the collection and disposal of refuse may be financed through general taxation, through service rates or through a combination of these methods."

**6.** This latter method is authorized by IC 19–2–1–10.